THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. SOLOMON MILLER, Defendant.

City Magistrates' Court of New York, Borough of Queens, First District, Sitting as a Court of Special Sessions, December, 1938.

*James Hurley* of counsel [*Charles C. Weinstein* with him on the brief; *William C. Chanler, Corporation Counsel*], for the People.

*Jacob Loewy* [*M. J. Donnelly* and *John E. O'Hora* and *Irving F. Lax* with him on the brief; *John E. O'Hora* of counsel], for the defendant.

COOPER, C. M.  Jurisdiction to hear and summarily dispose of the issues presented in this case with the same power and authority as a Court of Special Sessions, has been consented to by the defendant, in accordance with statutory power so provided. The testimony was adduced before a judge no longer a member of this bench, and by stipulation entered into last September between the corporation counsel of the city of New York and the attorney for the defendant, I have consented to pass judgment on the law and facts based on the stenographer's minutes of the trial, the exhibits introduced in evidence, and the memoranda submitted by the respective attorneys.

The defendant is charged with a violation of the provisions of subdivision 5 of section 139 of the Sanitary Code of the City of New York, which reads as follows:

" Section 139 — Food: sale of adulterated or misbranded prohibited; the terms ' food,' ' adulterated,' and ' misbranded ' defined.

" No person shall have, sell, or offer for sale in the City of New York any food which is adulterated or misbranded.  The term food as herein used shall include every article of food and every beverage used by man and all confectionery.

" Food as herein defined shall be deemed adulterated:    *    *    *

" (5) If it is colored or coated or polished or powdered, whereby damage is concealed or it is made to appear better than it really is."

The salient facts are not in dispute.  In the course of his regular duties an inspector of the health department of the city of New York visited a store operated by the defendant.  He ordered an orange drink.  Thereupon the defendant poured into a drinking glass a liquid which he took from a glass container displayed at the soda fountain and marked " Orange Juice."  To this the defendant added carbonated water and offered the resulting beverage to the inspector.  The latter, after apprising defendant of his official position, then took three equal samples of the orange drink, sealed and labeled them.  He left one of these samples with the defendant and delivered the other two for analysis to the laboratories of the health department.  It should be observed that the glass container marked " Orange Juice " had pasted on it a label plainly

reading: " Nesbitt's California Orange Juice Sweetened." On the same label in every small print appeared the words: " Fruit Acid, certified color and 1/10th of 1% Benzoate of Soda added — Directions: Use 1 part with 5 parts plain water, well iced."

The samples were thereafter chemically analyzed by a city chemist who, in the course of his testimony, stated that the orange drink served to the inspector contained sunset yellow, a coal tar derivative; that the sunset yellow has no nutritional value, takes on the appearance of an orange color, and when added to a liquid gives a resultant color similar to that produced by unadulterated orange juice. Unequivocal is his testimony to the effect that by the use of this coloring matter it is possible to employ fewer oranges in order to obtain a beverage having a coloration almost identical with that of pure orange juice. In these circumstances analysis alone, not the naked eye, can determine what percentage of the resultant color of the orange drink is produced by pure orange juice.

Testimony offered by the defense establishes that the jar bearing the label " Nesbitt's California Orange Juice Sweetened," to a portion of which the defendant added carbonated water in preparing the orange drink for the inspector, contained natural orange juice to the extent of fifty-one per cent by weight. To this was added sugar, benzoate of soda and coloring matter. A person long identified with the Nesbitt Company in California, which distributes large quantities of this product in many States throughout this country, testified upon the trial: " The sunset yellow in that product is made that color in order that it would look like the outside of an orange. The juice of the orange and the outside of an orange are entirely different. The soft drink trade is used to thinking in their own mind of a product as the outside of the fruit. That is the accepted practice in the soft drink trade. We feel we never misrepresented because a man goes to a soda fountain to get a soft appetizing drink, and he sees the soda water mixed with it, and he lays down his nickel, and when he goes out he feels that he had what he asked for."

The determination herein must necessarily depend upon a finding that the drink served the inspector was adulterated in that the coloring matter employed, sunset yellow, made the orange drink " appear better than it really is " — the prohibition incorporated within the statute.

In an exhaustive brief the defendant advances the contention that the statute in question is void for uncertainty and indefiniteness; that the Fourteenth Amendment to the Constitution of the United States makes it imperative that in framing its criminal

statutes a State is obliged to do so in such a manner that those to whom they are addressed may know with certainty what standard of conduct is required. It has long been established that " laws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid." ( *United States* v. *Brewer*, 139 U. S. 278, 288.) A man's conduct should not be " judged solely by the whim of the hour." ( *People* v. *Grogan*, 260 N. Y. 138, 147.) And so a statute which either forbids or requires the doing of an act must be so clear and concise that its terms are not " so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." (*Connally* v. *General Construction Co.*, 269 U. S. 385; *International Harvester Co.* v. *Kentucky*, 234 id. 216; *Ex parte Peppers*, 189 Cal. 682; 209 P. 896; *Wabash R. Co.* v. *O'Bryan*, 285 Fed. 583; *United States* v. *Armstrong*, 265 id. 683, 687.)

The statute involved in the instant case is not subject to these infirmities. It prescribes a standard of behavior easily comprehended by any one genuinely bent upon fair dealing with the consumer. The measurement involved is as simple in its application as the employment of the various tables of units in determining avoirdupois weight or liquid or long measure. The prescription in the case at bar is simplicity itself, for it can very easily be ascertained in advance that without the addition of any sunset yellow, the " orange " drink offered for sale to the inspector by the defendant, allowing for its various ingredients — some orange juice, sugar, fruit acid, benzoate of soda, etc.— would take on a jaded appearance and offer little taste satisfaction to the drinker. On the other hand, the addition of the coal tar derivative to the liquid under discussion gives a resultant drink the color and attendant taste sensation of which are similar to that produced by unadulterated orange juice. And so it is inescapable that the standard prescribed by the statute is clear and simple where good faith is behind its application.

The defendant calls attention to the case of *Waite* v. *Macy* (246 U. S. 606), wherein Mr. Justice HOLMES wrote: " The regulation makes the presence of any coloring matter an absolute ground for exclusion. But the only grounds recognized by the Statute are inferiority to the standard in purity, quality and fitness for consumption, words repeated over and over again in the act. It cannot be made a rule of law that any tea that has an infinitesimal amount of innocuous coloring matter is inferior in those respects to a standard that has a much greater amount of other impurities and is worth a quarter as much."

We are not dealing here with a small quantity of a harmless coal tar derivative added for the sole purpose of preserving or reviving color originally present. What we are confronted with is the addition of such a coal tar derivative in such quantity that the resulting color and attendant taste sensation give the consumer the definite impression that the drink contains much more pure orange juice than is or ever was factually present.

The defendant argues that there should be no more legal objection to his orange drink than there is to the approved method of adding harmless coloring matter to pure candy or a pinch of benzoate of soda to wholesome green peas — methods indulged in for the sole purpose of making an appeal to the eye and thereby awakening the desire to consume. To argue in this fashion is to give greater weight to the vaporous form of the statute than to the solid substance of its meaning, for in the case of the candy or green peas the addition of coloring matter does not replace any basic ingredients in the products themselves. On the other hand, the coloring matter added to the " orange " drink creates the impression that a substantially greater number of oranges have been used than actually were, and thus it is " made to appear better than it really is."

The defendant relies on the appeal decided in favor of the Nesbitt Company in May of this year by the United States Circuit Court of Appeals for the Fifth Circuit. The case, *United States* v. *Nesbitt Fruit Products, Inc.* (96 F. [2d] 972), involved the condemnation of 492 cases of one-gallon jugs labeled " Nesbitt's California Orange Juice, Sweetened," which it will be observed is identical with the legend on the label involved herein. The government contended that the jugs contained a mixture which concealed inferiority and that the label was false and misleading, all in violation of sections 7 and 8 of the Food and Drugs Act. While the court, with one judge dissenting, did not find these accusations supported by the facts and the law as limited in the act applicable thereto, it is important to observe a comment by the court supporting a finding adverse to the defendant in the case at bar: " It is true that the beverage which the retailer thus prepares and sells is inferior to pure orange juice in its vitamin content, and the added color tends to conceal the weakness of the orange juice content, but this beverage is not shipped in interstate commerce, and its preparation and sale is not within the Food & Drugs Act."

The dissenting opinion in that case ( *United States* v. *Nesbitt Fruit Products, Inc., supra*) is a complete answer, in my opinion, to another point raised by the defendant to the effect that the label on the jug containing the orange liquid from which the defendant

prepared the drink plainly sets forth the ingredients used in making the product; that the inspector " was not deceived into thinking that he was buying a straight orange juice drink; that he saw the drink made and knew exactly what he was getting." This presupposes that each customer places himself in such a position as to observe the very fine print appearing on the label and ignores the fact that from a practical point of view the vast majority of customers are totally unaware of what the vendor does in preparing the drink. Circuit Judge FOSTER in his dissenting opinion said: " Conceding that the product is not deleterious to health, it is certainly not orange juice sweetened in the ordinary meaning of those words. It might as well be called sugar acidulated. The words ' Orange Juice Sweetened ' are in large type. Other parts of the label fairly describing the ingredients are in very much smaller type. It is not probable that a purchaser of a drink made from the compound would notice the fine print. I consider the label tends to deceive and mislead the ultimate purchaser and therefore the article is misbranded within the prohibition of the Food and Drugs Act."

We are not concerned with whether the coal tar product added is injurious or detrimental. The question is rather one of fraud. Criminal intent is not essential to a violation of the section under review. (*People* v. *Greenberg*, 134 App. Div. 599; *Morris* v. *People*, 3 Den. 381.) The purpose of the section is two-fold: to apprise the public of the nature and the quality of the food that it is purchasing so that when one purchases food one gets the appropriate food value for the consideration paid, and to protect the public against deception. The average person when purchasing an orange drink, an orange beverage, orange juice or other liquid advertised to the public to have been obtained from oranges, expects that the liquid procured and imbibed is one whose coloring is a natural one derived from the extract of oranges. He has no way of ascertaining how much pure orange juice he is drinking, nor ability to detect the presence of sunset yellow which so deceptively takes on the color and attendant taste sensation of unadulterated orange juice.

Two memorandum opinions are to be found by the Appellate Division, Second Department, dealing with the particular subdivision of the section under consideration. They are *People* (*Complaint of Nelson*) v. *Levinson* (234 App. Div. 791) and *People* v. *Miller* (236 id. 846). In the first case the defendant was charged with its violation in that he had sold and offered for sale sponge cake which was adulterated by reason of the fact that it was colored with tartrazine, a yellow coal tar derivative, the presence of which

was not declared on the label attached to the package. The expert testimony offered in that case revealed that tartrazine has no food value and the use of such coloring matter gave the appearance that more eggs had been used than was factually true. The defense interposed was that tartrazine was used merely to make the product appear pleasing to the eye, such as coloring used in candy, soda, etc. The defendant introduced an exhibit which was on display in the showcase and read: "If you want good, wholesome cake, buy Lilly's Cake, all Lilly's Cakes contain certified food coloring," and also: "Lilly's Fancy Cake. This Cake contains four eggs to every pound. Certified food coloring added." In that case it was conceded on behalf of the People that four eggs were used. Did the coloring matter make the cake "appear better than it really is?" The Appellate Division reversed a conviction with the following decision: "Judgment of conviction by a city magistrate sitting as a Court of Special Sessions reversed upon the law. Information dismissed and fine remitted upon the ground that the prosecution failed to show any facts constituting a violation of chapter 20, article 9, section 139, subdivision 5 of the Code of Ordinances of the City of New York."

But not long thereafter the Appellate Division handed down a memorandum decision in *People* v. *Miller (supra)*, wherein it refused to follow its ruling in the case of *People (Complaint of Nelson)* v. *Levinson (supra)*, in these words: "Judgments of conviction by a city magistrate sitting as a Court of Special Sessions unanimously affirmed. Upon further consideration of the facts and the purpose of subdivision 5 of section 139 of the Sanitary Code we are of the opinion that the decision in *People (Complaint of Nelson)* v. *Levinson* (234 App. Div. 791) should not be followed."

In the latter case the defendant Miller was charged with a violation of the same subdivision 5 of section 139 of the Sanitary Code in that he offered for sale and sold sponge cake which was adulterated in that it was colored with tartrazine. The expert testified that tartrazine simulates the color of eggs and thereby gives the impression that the cake contains more eggs than actually used. The defendant admitted the use of tartrazine and testified that twelve eggs to the pound of sugar and pound of flour were used. He introduced into evidence an exhibit which read: "Our sponge cakes contain twelve eggs to every pound of sugar with certified coloring." Despite the defendant's argument that there could be no deception on the public in view of the sign he displayed that certified coloring was used in the baking of his cake, his conviction was unanimously sustained by the appellate court.

An examination of the record on appeal in the *Miller* case (*supra*) reveals testimony given by a city chemist which by its very simplicity of expression enables one to see not alone the laudably protective purpose of the statute involved but the difference between the use of a small quantity of harmless coloring matter for the purpose of " eye appeal " and its use in large quantities, as in the case at bar, as a substitute for valuable ingredients whereby the resultant product is made " to appear better than it really is." The chemist testified: " Tartrazine therefore robs the cake of some of its food value. * * * If twelve eggs are used to the pound and then add tartrazine it gives the impression of fourteen or sixteen eggs to the pound, and under those conditions the nutritious value of two or four eggs to the pound is lost."

An " orange " drink such as offered for sale by the defendant in the instant case not alone is watered to the extent of five parts water to one part orange concentrate, but the latter is fairly well saturated with a coal tar derivative to such an extent that the liquid finally offered the customer for consumption presents an appearance and attendant taste sensation which are deceptive and a disguise for those nutritive and valuable properties which the public has a right to believe are contained in an orange drink. Thus the prohibition of the statute, set forth in unambiguous language for those who in good faith are desirous of measuring their products by a simple standard before offering them for sale, has been clearly violated.

In these courts the duty devolved upon those charged with this and related statutes looking to the protection of the public, not only from the point of view of deception but of health, is constantly brought into play. Those who can afford the " prime cuts " of food with all the attendant care in handling that substantial prices make possible, should not lose sight of the fact that the large majority of consumers must " watch their pennies " and consequently that all too often they are unknowingly subjected to the harm that flows from food that is sub-standard — deficient in health giving and protecting qualities — and food that is impure and consequently injurious to health, sometimes manifesting its consequences promptly, but all too frequently slowly and painfully.

Milk deficient in solids and fat content; dead clams used in clam chowder; the failure to keep records as prescribed by statute as to the sources of shell fish sold; unfresh meat into which a chemical substance has been injected in order to give a fresh appearance and have " eye appeal; " these are some of the tricks of the trade. We are not speaking of an error in judgment for which allowance must be made; we are referring to acts willfully perpetrated or the

result of such unwarranted neglect or gross carelessness as to be equally reprehensible. In the latter class of cases a small fine is no deterrent. The court records amply prove that such type of offender chalks up such a disposition to business overhead and unconcernedly goes on with his practices. Upon a finding of guilt the disposition should be swift and severe.

Defendant found guilty.